UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

MICHAEL S. NAUMOVSKI,

              Plaintiff,

   -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

              Defendant.

**DECISION and ORDER
No. 1:12-CV-0080(MAT)**

———————————————————————

## I.  Introduction

Michael Naumovski ("Plaintiff"), represented by counsel, brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying his application for Disability Insurance Benefits ("DIB").

## II. Procedural History

Plaintiff applied for DIB on June 27, 2005, alleging disability beginning February 28, 2005, due to numerous impairments, including degenerative disk disease, radiculopathy, and stenosis; diabetes and associated neuropathy; carpal tunnel syndrome; weakness of the upper and lower right extremities; and

---

[1]
Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

obesity. T.41-46.[2] After his application was denied, Plaintiff appeared with counsel at a hearing before Administrative Law Judge Bruce Mazzarella ("the ALJ") on April 2, 2008. T.258-302. The ALJ issued an unfavorable decision on June 2, 2008. T.17-29. The Appeals Counsel denied Plaintiff's request for review on August 6, 2009. T.3-5. Plaintiff then filed an appeal in this Court. <u>Naumovski v. Astrue</u>, No. 1:09-cv-00862-RJA-HBS (W.D.N.Y. 2009)

On August 26, 2010, Magistrate Judge Hugh B. Scott issued a report and recommendation agreeing with Plaintiff that the ALJ's decision was not based on substantial evidence because it relied on pre-onset-date medical evidence and ignored much of the post-onset-date medical evidence, namely, the treatment notes of treating physician Andrew Matteliano, M.D. The Court (Arcara, D.J.) adopted the report and recommendation, and the matter was remanded for further administrative proceedings. T.350-58.

A new hearing was held on July 20, 2011, before the same ALJ, T.623-49, who issued an unfavorable decision on August 22, 2011. T.323-35. The Appeals Council declined to assume jurisdiction, T.314-16, stating that the ALJ had provided persuasive explanations for the weight he had given all the medical opinions and had established a residual functional capacity consistent with the record.

---

[2]

Citations to "T." refer to pages in the certified copy of the administrative transcript, filed by the Commissioner in connection with her answer to the complaint.

This action followed. Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## III. Summary of the Administrative Record

### A.   Medical Evidence Prior to February 28, 2005

Plaintiff was involved in a serious motor vehicle accident at work on March 24, 2003, in which he sustained injuries to his neck, left shoulder, and lower back. T.224. He did not return to work after the accident. Between May 1, 2003 and February 19, 2005, Dr. Matteliano, a physical medicine and rehabilitation specialist, regularly treated Plaintiff for his spinal impairments. See T.224, 427-428.

On June 27, 2003, MRI studies of the thoracic spine showed significant multilevel disk disease, with moderate disk herniations at T3-4, T4-5, and T8-9. The T3-4, T4-5, and T8-9 herniations indented the thecal sac and impinged the left ventral aspect of the spinal cord. T.232. A small to moderate herniation at T5-6 slightly indented the thecal sac and partially effaced the ventral subarachnoid space. Small herniations were present at T6-7 and T7-8, along with a disk bulge at T2-3. T. 232, 233.

On February 19, 2005, cervical MRI studies showed mild spondylosis at C4-5 with facet and uncovertebral hypertrophy resulting in mild bilateral foraminal stenosis with a small left disk herniation slightly indenting the thecal sac; mild spondylosis

at C5-6 with a mild disk bulge protruding slightly asymmetrically to the right of midline compared to the 2003 study, and facet and uncovertebral hypertrophy with mild bilateral foraminal stenosis; minimal stenosis at C6-C7 with a small central protrusion minimally indenting the thecal sac, not present in the 2003 study; and evidence of upper to mid-thoracic disk disease. T.229.

After a four-month work hardening program, Dr. Matteliano released Plaintiff to perform heavy work on April 5, 2004. T.207. However, Plaintiff was unable to sustain that exertional level and relapsed.

On January 28, 2005, Dr. Matteliano noted Plaintiff had been missing work due to worsening cervical spine pain which radiated down both arms. Dr. Matteliano observed associated dysesthesia and weakness in both wrists. Cervical range of motion was restricted, with tenderness in the lower cervical elements and flattening of the cervical lordosis. Loss of sensation to pinprick was noted along the dorsum of each forearm. T.190. Plaintiff had decreased grip strength (4+/5) bilaterally and loss of strength (4/5) bilaterally of the wrist extensors. T.191.

### B.   Medical Evidence On or After February 28, 2005

On February 28, 2005, Dr. Matteliano reviewed the results of Plaintiff's cervical spine MRI, noting cervical foraminal stenosis, along with degenerative pathological changes in comparison to the previous imaging studies. Plaintiff had been experiencing upper

extremity pain and numbness, which limited his ability to turn or bend his neck; loss of sensation over the dorsum of the forearm; and continued left arm weakness. T.188. Based on his examination findings and the recent cervical spine MRI, Dr. Matteliano found that Plaintiff had a total, temporary disability.  T.189.

From March through September of 2005, Dr. Matteliano regularly treated Plaintiff, who continued to attend physical therapy but was unable to return to work. On each examination, Dr. Matteliano increased the projected length of time that Plaintiff would be out of work. Dr. Matteliano's notes indicate that Plaintiff experienced some short-term improvements followed by worsening of his condition. T.178-87.

On September 16, 2005, Dr. Matteliano noted that Plaintiff continued to have pain in the thoracic and cervical spinal regions and pain in his left shoulder, with decreased range of motion. Palpitation elicited paraspinal muscle spasm of the thoracic spine. T.176.

On September 20, 2005, consultative physician Fenwei Meng, M.D. examined Plaintiff at the Commissioner's request. Plaintiff had decreased range of motion in the cervical and lumbar spinal regions, and in the shoulders. T.149. Dr. Meng opined that Plaintiff had minimal limitations in manual dexterity and moderate limitations in bending and extending the cervical spine, and turning the head to the side. Plaintiff had mild limitations in

lumbar bending, extension, twisting, and heavy lifting; mild limitations in pushing, pulling and heavy lifting; and no limitations in walking, standing, or running up and down stairs.

On September 29, 2005, Ronald Palazzo, M.D. examined Plaintiff and noted that he had herniated disks, upper extremity numbness, and loss of hand strength. Plaintiff was taking Lortab and Soma, and using Lidoderm patches. T.161.

On October 14, 2005, Dr. Matteliano noted that Plaintiff was having persistent pain throughout his spine, worse in the thoracic region. Abduction of the left shoulder also produced pain. Cervical range of motion was reduced to less than 50% of normal extension, and lateral rotations were to 40 degrees on the left and 60 degrees on the right. There was tenderness over the cervical and thoracic areas, paraspinal muscle spasm over the thoracic region, lumbar tenderness and reduced range of motion. T.174. Dr. Matteliano stated that Plaintiff was "totally disabled from all work."[3] Dr. Matteliano stated that Plaintiff was "not expected to improve and ha[d] a high level of functional impairment due to the chronic continual nature of the pain he was experiencing." Plaintiff was continued on medications and a home exercise regimen. T.175, 456-457.

---

[3]
    Because Plaintiff's employer, Ford Motor Company, had no "light duty work" available, he was placed on disability retirement in 2005.

On November 11, 2005, Dr. Matteliano noted tenderness in, and muscle spasm diffusely over, Plaintiff's thoracic region. Plaintiff continued to have tenderness with decreased range of motion in the cervical and lumbar regions. T.172. Dr. Matteliano opined that Plaintiff was "totally disabled from all work". T.173.

On February 15, 2006, Dr. Matteliano examined Plaintiff and noted that he continued to have left shoulder pain and tenderness over the cervical, thoracic, and lumbar spinal regions. Cervical extension was less than half of normal, and rotation was limited to 40 degrees bilaterally. T.170. Dr. Matteliano stated "[t]here is total disability from work. He has multiple levels of injury to the spine. He is not expected to improve." T.171.

On June 5, 2006, Dr. Palazzo noted that Plaintiff had numbness in the right hip and leg. T.159. On July 21, 2006, an MRI of Plaintiff's lumbar spine showed lower lumbar facet hypertrophy but no disk bulges or herniations. T.426.

On October 2, 2006, Dr. Matteliano observed that electrodiagnostic studies of the right lower extremity indicated moderately severe peripheral polyneuropathy of diabetic origin. Plaintiff had persistent pain and stiffness in his cervical and lumbar regions, pain radiating into his right lower extremity, and difficulty with prolonged standing and ambulation. On examination, Plaintiff had tenderness throughout the thoracic and lower cervical regions. T.449.

On May 18, 2007, Dr. Matteliano examined Plaintiff and reported findings consistent with previous examinations. He opined that Plaintiff remained totally disabled, stating that Plaintiff "has neuropathic pain related to multi-level discopathy". T.442.

On March 19, 2008, an electrodiagnostic study of Plaintiff's upper extremities yield results consistent with right medical neuropathy at the wrist level. T.256-57.

On November 30, 2009, neurologist J. Maurice Hourihane, M.D. examined Plaintiff in regards to his complaints of right-side weakness. On examination, Plaintiff's reflexes were 1 in the upper extremities and absent at the knees and ankles. Sensation to pinprick was decreased to just below Plaintiff's knees. Dr. Hourihane noted that Plaintiff's fine finger movements "broke down fairly quickly" on the right side, and he had trace weakness on the right side. Dr. Hourihane opined that Plaintiff's right-sided symptoms were the product of an extrapyramidal process. T.533.

On December 15, 2009, Plaintiff followed up with Dr. Hourihane, who found no substantial abnormality in the brain scans but did see a moderate degree of cerebellar atrophy. Some mild amount of disk disease was present in the old spinal MRI scans but nothing that would cause Plaintiff's current reported difficulties. T.529.

On January 29, 2010, Plaintiff consulted with neurologist and neuro-movement specialist Xiuli Li, M.D., based on Dr. Hourihane's referral. Plaintiff described a gradual decrease in his ability to move his right arm, which became significantly noticeable in the summer of 2009. Plaintiff also complained of hand tremors and difficulty moving his right leg. He had difficulty putting on pants, due to significant stiffness and slowness of his right arm. Plaintiff also reported balance problems due to decreased movement in his right leg and difficulty operating the accelerator and brake pedals in his car. T.526. On examination, Dr. Li noticed that Plaintiff had a couple of beats of resting tremor involving the right hand and arm. Tremor from increased rigidity involving the right wrist and right leg was not consistent. Plaintiff had slightly decreased sensation in the distal regions of the feet, most pronounced in the plantar areas. He had diminished knee and ankle reflexes due to diabetic neuropathy, and decreased right arm swing during ambulation. Dr. Li observed that Plaintiff limped slightly, favoring his right leg. Plaintiff's stepping was remarkably slow. T.527.

On March 9, 2010, opthamologist David DiLoreto, Jr., M.D., Ph.D. diagnosed Plaintiff with bilateral severe nonproliferative diabetic retinopathy. T.519. On June 7, 2010, Plaintiff saw Norma Quijada, M.D. who noted that Plaintiff was not keeping track of

his blood glucose readings because he had difficulty writing. T.580.

On June 28, 2010, consultative physician Nikita Dave, M.D., examined Plaintiff at the Administration's request. Dr. Dave noted that Plaintiff had pain of a "constant 4/10 intensity today" with gait abnormalities including an absence of right arm swing and a slight inversion of the right ankle and drag of the lateral toes. Plaintiff's right leg was longer than the left by ½ to 1 inch. Standing, he had 3 to 5 degrees of right knee flexion that he was unable to correct. Plaintiff was unable to maintain heel stance and he had difficulty with heel gait and right-side toe gait. T.553. Plaintiff had mild atrophy in the right upper arm and forearm segments as compared to the left T.554. Sensation in the legs and feet was decreased in a bilateral stocking distribution. Plaintiff had some fine tremor, primarily in his right hand and right leg. There was decreased sensation over his right forearm. Dexterity of his right fingers was slightly decreased. Strength in the right arm was decreased (5-); in the right leg, strength also was decreased (4+ to 5-). Grip strength was 5- on the right, compared to 5 on the left. Plaintiff could button and tie with slightly decreased functionality. T.555.

On July 1, 2011, Plaintiff was examined by neurosurgeon John Fahrbach IV, M.D. in regards to his right-sided weakness. Dr. Fahrbach noted that Plaintiff had experienced progressively

worsening right-sided symptoms including weakness and tremor. Plaintiff had difficulty walking as a result of these symptoms and had involuntary tremors of the right arm and leg, even while sleeping. T.605. On examination, Plaintiff had antalgic gait and intention tremor of the right arm, and "what may be a hint of clonus" bilaterally. Sustained clonic jerking of the right lower extremity was present. T.606.

## IV.  General Legal Principles

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

"In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004). The reviewing court first evaluates the Commissioner's application of the pertinent legal standards, and then, if the standards were correctly applied, considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an

unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.   The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2011, and had not engaged in substantial gainful activity since February 28, 2005.

Plaintiff was found to have the following severe impairments: chronic cervical and thoracic degenerative disc disease with small disc protrusions; diabetes with mild neuropathy of the feet; mild left shoulder arthritis; and carpal tunnel syndrome of the right (non-dominant) hand. The ALJ evaluated Plaintiff's limitations against the criteria of Listing 1.04 (Disorders of the spine) and found that Plaintiff's "[d]iagnostic imaging scans" did "not establish spinal arachnoiditis [for purposes of Listing 1.04(B)], pseudoclaudication [for purposes of Listing 1.04(C)] or the combination of nerve root impairment with consistently positive straight leg raise tests [for purposes of Listing 1.04(A)]," and "thus the severity criteria of Listing 1.04 have not been met[.]" With regard to Plaintiff's diabetes, the ALJ found that it had not resulted in neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, gait and station; or acidosis occurring at least on the average of once

every 2 months; or retinitis proliferans. Therefore, the severity criteria of former Listing 9.08 had not been met.[4] The ALJ further found that the criteria of Listing 1.02(B) (Major dysfunction of a joint, with involvement of one major peripheral joint in each upper extremity) had not been met because Plaintiff's left shoulder impairment and left carpal tunnel syndrome had not resulted in the inability to perform fine or gross motor movements as defined by Listing 1.00(B)(2)(c).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") and found he can sit for an eight-hour workday with only normal breaks and meal periods; stand and/or walk on an occasional basis, up to two hours in an eight-hour workday; lift and carry up to 10 pounds on an occasional basis; can occasionally stoop, crouch, kneel or climb stairs; and can never climb scaffolds or unprotected heights. The ALJ compared Plaintiff's current RFC and the objective medical evidence with his past relevant work descriptions, and found him unable to perform any past relevant work.[5]

At the fifth step, the ALJ determined that Plaintiff's "non-exertional limitations do not affect a full range of sedentary

---

[4] Diabetes mellitus (Listing 9.08) previously was contained in the Endocrine Disorders (Listing 9.00).  However, the Administration has deleted diabetes mellitus as a listing-level disabling condition.  See 20 C.F.R. §§ 404.1594(c)(3)(i), 416.994(b)(2)(iv)(A).

[5] Plaintiff last was employed a car manufacturer parts-handler (unskilled, medium exertional level) at Ford Motor Company.

level work (SSR 96-9p and SSR 83-14)". He therefore found that Plaintiff had not been under a disability since the onset date.

## VI.  Discussion

### A.  Erroneous Analysis of Listing 1.04(A)

Plaintiff argues that the ALJ "appears to have grossly misapplied" Listing 1.04(A) "by requiring 'consistently positive straight leg raise tests.'" Plaintiff's Memorandum of Law ("Pl's Mem.") (quoting T.325).  As Plaintiff notes, his spinal impairments are located in the cervical and thoracic regions. Positive straight leg raising test results are *only* relevant when Listing 1.04(A) is applied to lumbar spinal impairments, as discussed further below.

To satisfy Listing 1.04(A), Plaintiff must establish that he suffers from a disorder of the spine, with

> A. [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss *and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);. . . .*

20 C.F.R. Pt. 404, Subpt. P, App. 1 , § 1.04(A) (emphasis supplied). The Court agrees with Plaintiff that because he is not alleging involvement of the lower back, he is not required to demonstrate positive straight-leg raising test results in order to meet Listing 1.04(A). By finding that Plaintiff did not meet Listing 1.04(A) because he did not demonstrate positive straight-leg raising test (supine and sitting), the ALJ

misinterpreted the plain language of Listing 1.04(A) and misapplied the criteria. See Szarowicz v. Astrue, No. 11-CV-277S, 2012 WL 3095798, at *3 n.5 (W.D.N.Y. July 30, 2012) ("Based on the record, it appears undisputed that Plaintiff's injury does not involve the lower back, and therefore this Listing requirement [of positive straight-leg raising test] does not apply.").

Plaintiff argues that he meets the applicable criteria of Listing 1.04(A), i.e., nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. Plaintiff notes that objective medical evidence, namely imaging studies, shows nerve root compression as indicated by indentation of the thoracic spinal cord at three vertebral levels, T.232-33, and indentation of the thecal sac at two cervical levels, T.229. He states that neuroanatomic distribution of pain in the cervical territories has been documented over the course of multiple examinations. See T.176, 188, 254, 442, 449. Treating source Dr. Matteliano stated, on May 17, 2007, that Plaintiff had neuropathic pain related to multilevel discopathy, T.442, and decreased cervical range of motion was consistently noted by Plaintiff's treating and examining physicians. See T.149, 170, 172, 174, 176, 190, 254, 442, 443. Consultative physician Dr. Dave noted that Plaintiff had atrophy in the right upper extremity. T.554.

Other physicians, including neurological specialists, have noted that Plaintiff had upper extremity weakness. T.168, 188, 190, 254, 555, 605. Sensory loss in Plaintiff's upper extremity was noted at various examinations. T.189, 190, 254, 555.

The only reason that the ALJ gave for finding that Plaintiff did not meet Listing 1.04(A) was the absence of positive straight leg raising test results. However, as the Court has found, this was erroneous. Plaintiff's symptoms and limitations, as summarized in the preceding paragraph, "appear to match those described in the Listings," in which case "the ALJ must explain a finding of ineligibility based on the Listings." Kovacevic v. Chater, No. 94-CV-600S, 1995 WL 866425, at *8 (W.D.N.Y. Sept. 29, 1995) (citing Booker v. Heckler, No. 83 Civ. 5300(RLC), 1984 WL 622, at *3 (S.D.N.Y. July 19, 1984)); Szarowicz, 2012 WL 3095798, at *5 ("It is particularly important for an ALJ to specifically address conflicting probative evidence with respect to the step three analysis, because a claimant whose condition meets or equals that of a Listing is deemed disabled per se and eligible to receive benefits.") (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526); see also Kerr v. Astrue, No. 09-CV-01119(GLS), 2010 WL 3907121, at *5 (N.D.N.Y. Sept. 7, 2010). Where, as here, there is significant probative evidence that a claimant meets the criteria for a Listing at step three, he is "owed a more substantive discussion" of why he did not meet a particular Listing. Kerr, 2010 WL 3907121, at *6

(remanding where ALJ summarily found plaintiff did not meet Listing 1.04(A) without discussing medical evidence supporting the various criteria of that listing) (citation omitted).

On remand, the ALJ is directed to re-apply the criteria of Listing 1.04(A), with respect to specific, pertinent medical evidence in the record. The ALJ must not require a finding of positive straight leg raising test because, as discussed above, Plaintiff is not alleging lower back involvement. If Plaintiff is once again found not disabled at step three, the ALJ must articulate which criteria from Listing 1.04(A) Plaintiff failed to meet and which evidence he relies on to support that finding. Id.

**B.   Failure to Evaluate Plaintiff's Obesity**

"There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment." SSR 02-1 P, 2000 WL 628049, at *4. Rather, the Commissioner will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable impairment, "it significantly limits an individual's physical or mental ability to do basic work activities." Id. Although Plaintiff correctly notes that his BMI reading of 35.7 in June 2010, results in a categorization of "obesity" under the Commissioner's regulations, this fact alone does not mean that the ALJ's failure to discuss his obesity was error. See Macaulay v. Astrue, 262 F.R.D. 381, 388 n. 8 (D. Vt. 2009) (citing SSR 02-1 p) (noting that a BMI of 40 or greater

-17-

"carries the greatest risk for developing obesity related impairments, but does not necessarily correlate with any specific degree of functional loss"). The Court notes that neither Plaintiff's treating sources nor the consultative examiners diagnosed him with obesity or recommended that he lose weight. Given that the physicians who examined and treated Plaintiff have not opined that Plaintiff's obesity contributed to his functional limitations, the Court does not find that the ALJ erred in failing to consider Plaintiff's obesity in conjunction with his other impairments.

### C.   Errors in the RFC Assessment

"It is well-settled that '[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Hogan v. Astrue, 491 F. Supp.2d 347, 354 (W.D.N.Y. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. 1996); citing Balsamo v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998)). Here, after setting out Plaintiff's RFC, the ALJ merely summarized the medical evidence and did not discuss how the medical evidence supported his conclusion that Plaintiff could "sit for an eight-hour workday with only normal breaks and meal periods; stand and/or walk on an occasional basis, up to two hours in an eight-hour workday; and lift and carry up to 10 pounds on an

occasional basis." Thus, it is wholly unclear from the decision how the ALJ arrived at these findings regarding Plaintiff's ability to sit, stand, walk, lift, and carry. Because the ALJ simply recited the medical record, and failed to cite to any specific medical opinions to support his RFC findings, the Court is unable to determine if the ALJ improperly selected separate findings from different sources, without relying on any specific medical opinion. Hogan, 491 F. Supp.2d at 354 (citing Dailey v. Barnhart, 277 F. Supp.2d 226, 235 (W.D.N.Y. 2003)).

Furthermore, the ALJ's RFC assessment contains no discussion of any non-exertional limitations, despite the fact that an assessment of Plaintiff's ability to perform sedentary jobs necessarily must focus on his ability to use his upper extremities. See SSR 96-9p, 1996 WL 374185, at *8 (S.S.A. 1996) ("Most unskilled sedentary jobs require good use of both hands and the fingers, i.e., bilateral manual dexterity. . . . Any *significan*t manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.") (emphasis in original). Here, the medical evidence of record supports a finding that Plaintiff has limited use of his upper extremities. For instance, on May 10, 2005, Dr. Matteliano noted that Plaintiff is unable to complete most household chores as "his hands tremble when holding light objects" such as a coffee cup.

T.138. On September 29, 2005, Dr. Palazzo noted numbness down both of Plaintiff's arms, into his hands and fingers, and loss of hand strength bilaterally. T.161. On November 30, 2009, neurologist Dr. Hourihane stated that Plaintiff's "fine finger movements broke down rather quickly on the right side." T.533. On January 29, 2010, neuro-movement specialist Dr. Li observed hand tremors during his examination of Plaintiff, who complained of difficulty donning pants due to stiffness and slowed movement of his right arm. T.526.[6]

On July 1, 2011, neurosurgeon Dr. Fahrbach noted that Plaintiff had progressively worsening right-sided weakness and tremor. T.605-06. Plaintiff testified that he experienced pain, weakness, and difficulty controlling his right hand, so much so that he could not lift an empty glass. T.642, 647.

Notwithstanding these clinical observations and findings by Plaintiff's treating physicians, the ALJ did not incorporate any non-exertional limitations related to Plaintiff's impaired manual dexterity into the RFC. See Kiskiel v. Commissioner of Soc. Sec., No. 06-CV-3612(FB), 2007 WL 1725412, at *4 (E.D.N.Y. June 12, 2007) (finding error where the ALJ summarily stated that sedentary work base not eroded by claimant's non-exertional limitations, but the

---

[6]  The Court notes that only two of the three pages of Dr. Li's report is contained in the administrative record, i.e., T.526-27. Page 528 is a new medical record from a different provider. On remand, the ALJ is directed to obtain a complete copy of Dr. Li's report, as it may contain additional evidence relevant to Plaintiff's functional limitations.

that the record included medical evidence claimant suffered from
nonexertional limitations, such as climbing, kneeling, balancing,
crouching, crawling, stooping, reaching, and feeling). Instead, the
ALJ relied on the statement by consultative physician Dr. Dave (who
is not a neurological specialist) that she did not find any
limitations in Plaintiff's ability to use his hands for work-
related activities. While an ALJ is entitled to resolve conflicts
in the evidentiary record, Ferraris v. Heckler, 728 F.2d 582, 587
(2d Cir. 1984), he "cannot pick and choose evidence that supports
a particular conclusion." Smith v. Bowen, 687 F.Supp. 902, 904
(S.D.N.Y. 1988) (citing Fiorello v. Heckler, 725 F.2d 174, 175-76
(2d Cir. 1983); other citation omitted); see also Solsbee v.
Astrue, 737 F.Supp.2d 102, 113 (W.D.N.Y. 2010) ("Th[e] selective
adoption of only the least supportive portions of a medical
source's statements is not permissible.") (citation omitted);
Correale-Englehart v. Astrue, 687 F. Supp.2d 396, 439 (S.D.N.Y.
2009) (finding error where "the ALJ cherry-picked some of the
findings of the [doctor]—notably those that minimized plaintiff's
. . . limitations—and ignored others").

Furthermore, the ALJ downplayed the severity of Plaintiff's
arm and hand limitations based on his failure to undergo surgery to
correct his right-side carpal tunnel syndrome ("CTS"). This is
problematic for two reasons. First, it assumes Plaintiff's upper
extremity tremors and weakness were caused by his CTS, whereas

neurologist Dr. Hourihane stated that the right-sided weakness "probably" indicated a "poverty of motion and extrapyramidal[7] signs[.]" T.533. In addition, Dr. Hourihane noted that Plaintiff had negative Tinel's sign and Phalen's maneuver, id., whereas CTS is often implicated where these tests yield positive results.[8] Moreover, the record indicates that Plaintiff was not a candidate for surgery given his long-standing diabetes. See T.138 (note from Dr. Matteliano dated May 10, 2005, indicating that surgery on Plaintiff's cervical spine precluded due to diabetes).

In light of the evidence in the record that Plaintiff suffers from nonexertional limitations due to symptoms involving his right upper extremity (e.g., weakness, slowness of movement, tremors, diminished ability to perform fine finger movements), the ALJ should have expressly considered whether these nonexertional limitations affected the range of sedentary work that Plaintiff can perform. Accordingly, the matter must be remanded for the ALJ to clarify his RFC determination. Kiskiel, 2007 WL 1725412, at *4 (ordering remand where, despite medical evidence of numerous non-

---

[7]

The extrapyramidal system is a "network of nerve pathways" that "influences and modifies electrical impulses that are sent from the brain to the skeletal muscles." The American Medical Association Encyclopedia of Medicine 428 (C. Clayman ed., 1989). Damage or degeneration to the system's components "can cause a disturbance in the execution of voluntary (willed) movements and in muscle tone, and can also cause the appearance of involuntary (unwanted) movements such as tremors, jerks, or writhing movements." Id.

[8]

See, e.g., http://ahn.mnsu.edu/athletictraining/spata/wristhandfingermodule/specialtests. html (last accessed Sept. 5, 2014).

exertional limitations, the ALJ, "without explanation, . . . found that [plaintiff's] 'capacity for sedentary work has not been compromised by any nonexertional limitations'") (citing Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) ("Remand is particularly appropriate" where reviewing court is "unable to fathom the ALJ's rationale in relation to the evidence in the record" without "further findings or clearer explanation for the decision.") (citation and internal quotation marks omitted)).

### D.   Failure to Obtain Vocational Expert Testimony

Plaintiff argues that the ALJ erred in finding that the Medical Vocational Guidelines ("the Grids") directed a conclusion of "not disabled". Plaintiff also asserts that the ALJ erred in failing to elaborate on what he included in Plaintiff's "additional limitations" and why they only have "little to no effect" on his ability to perform of the full range of sedentary work.

The Commissioner's "regulations require an ALJ to consider all of a claimant's non-exertional impairments, and to determine the extent to which those impairments limit the claimant's ability to perform the full range of work of a given exertional category." Hilsdorf v. Commissioner of Soc. Sec., 724 F. Supp.2d 330, 354 (E.D.N.Y. 2010). The Commissioner has recognized that an inability to perform tasks requiring bilateral manipulative ability, over a sustained period of time, severely limits the sedentary occupational base. See SSR 96-9p, 1996 WL 374185, at *8 (S.S.A.

1996). As the Second Circuit has noted, "sole reliance" on the [g]rid[s] "may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation marks and citations omitted; alterations in original).

On remand, once the ALJ determines Plaintiff's RFC after conducting an appropriate sequential evaluation, he may find that Plaintiff's nonexertional impairments, such as his reduced bilateral manual dexterity, "significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the [Grids]." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986). If that is the case, the ALJ must consult with a vocational expert or obtain similar evidence at step five for purposes of establishing the existence of jobs in the national economy that Plaintiff can perform. Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

## VI.  Conclusion

For the reasons discussed above, Defendant's motion (Dkt #12) for judgment on the pleadings is denied. Plaintiff's cross-motion (Dkt #14) for judgment on the pleadings is granted to the extent that the Commissioner's decision is vacated, and the matter is

-24-

remanded for further administrative proceedings consistent with this opinion. In particular, the ALJ is directed to (1) obtain a complete copy of Dr. Li's report, only two pages of which are currently set forth at pages 526-527 of the administrative transcript; (2) re-evaluate whether Plaintiff meets or medically equals Listing 1.04(A), citing specific medical evidence and giving reasons for this decision; (3) re-assess Plaintiff's RFC, giving consideration to the medical evidence of Plaintiff's upper extremity limitations; and (4) obtain vocational expert testimony if necessary.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    September 8, 2014
          Rochester, New York